# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara L. Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

June 12, 2026

**By Email and ECF**
Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street, Room 1620
New York, New York 10007

Re: **United States v. Hiram Carrero**
    **25 CR 593 (LJL)**

Dear Judge Liman:

In May, two months after his nineteenth birthday, while in the visiting room at the MDC, Hiram Carrero learned for the first time that the woman he had always believed was his mother was actually his aunt who had adopted him at birth. He learned this information not from his mother, but from his legal team. As tears silently streamed down his face, Hiram also learned that he was born prematurely with drugs in his system and that both of his biological parents abandoned him in the neonatal intensive care unit ("NICU"). PSR, ¶46.

The circumstances of his birth resulted in neurodevelopmental challenges that have shaped Hiram's young life. He is only beginning to understand himself and how his history, previously unknown to him, may have contributed to his offense. Although he was not considering the consequences of his actions in the early morning hours of December 1, 2025, he certainly understands now that he must face punishment for the pain and suffering he caused. He pleaded guilty within weeks of his arrest, entered a federal adult prison at eighteen years old, and will spend a minimum of five years in custody.

The probation department has recommended a downward variance from the sentencing guidelines because of mitigating factors that "should be given considerable weight." PSR at 25. For the reasons set forth below, particularly Hiram's age, lack of prior criminal conduct, untreated mental health and substance use issues, remorse and "meaningful potential for further maturation and rehabilitation," I ask the Court to follow the recommendation of the probation department and impose a sentence of sixty months, with three years of supervised release. PSR, ¶60, p. 24-25.

## Background

Hiram, born March 12, 2007, suffered medical complications and neurodevelopmental impairment as a result of his premature birth and exposure to drugs *in utero*. He remained in the NICU for several months, requiring heart surgery and treatment for a club foot. PSR, ¶46. Beginning in preschool, he received early intervention, including physical therapy, occupational therapy and speech therapy, as well as special education services. PSR, ¶53.

Hiram was raised by both his grandmother and adoptive mother during his early childhood. PSR, ¶40. The family recalls spending summer weekends in various parks, with Hiram riding bikes, running in and out of sprinklers and visiting the city pool at 129th Street. *See* Letter of Wanda Carrero, Ex. A; Letter of Elizabeth Carrero, Ex. B.



*Hiram at age 6 or 7*



*Wanda and Hiram in his first-grade classroom*

Wanda Carrero did the best she could raising Hiram, but she had her own physical and mental health challenges. ████████████████████████ ████████████████████████ *Id.* For these reasons, she has been unable to visit her son at MDC, although she did try on one occasion, before collapsing in the lobby while waiting to enter. PSR, ¶9, fn1.

Shortly after Hiram's arrest, Hiram's former ELA teacher from 6th and 7th grade reached out, via email, because she felt "someone connected to his defense needs to understand more about his intellectual capacity or lack thereof." Email from Anne Marie Weiss dated December 8, 2025, attached as Exhibit C. She

recalled that "Hiram had when I knew him an approximate IQ of 80, which puts him in the very low range. While he is capable of participating in society, he is certainly not capable of inferential thought. Hiram never was, when I knew him, able to connect and understand hypothetical situations. He had great difficulty making a connection between events and their consequences." *Id.*

In a subsequent letter to the Court, Ms. Weiss writes, "The young boy that I knew was kind though he badly needed stability and belonging. His teachers knew his family to be well intentioned though unable to effectively do anything meaningful to support Hiram's academic needs. His mother was disabled . . . and therefore never able to attend any meetings in person. Hiram was, as a middle schooler, often needed to help his parent navigate her own needs." Ex. D.

Hiram found the academic demands challenging, but during middle school he continued to attend school regularly and was respectful to students and teachers. When the COVID pandemic moved all classes online, things fell apart for him. Without the structure of in-person school, he was distracted and could not learn remotely.

In connection with sentencing, Hiram was evaluated by a licensed clinical and forensic psychologist, Dr. Fiona Radcliffe. *See* May 29, 2026 Forensic Report, attached as Exhibit E. In her report Dr. Radcliffe discusses the impact of the pandemic on Hiram's functioning: "Although Hiram had demonstrated educational vulnerabilities prior to this period, available records and collateral information suggest that his academic participation, attendance, and overall functioning declined substantially following the disruption of in-person schooling and daily structure associated with the pandemic. In addition, his paraprofessional was terminated after he returned to in-person learning." Ex. E at 5.

Hiram turned thirteen on March 12, 2020, and within months, he had started skipping classes and smoking marijuana. PSR, ¶62; Ex. E at 5. It was also shortly after the pandemic began that his grandmother, who had been like a second mother to him and "provided substantial supervision and structure," died. PSR, ¶41; Ex. E at 5. After his grandmother's death, his drug use escalated. From 2021 until he was arrested in December 2025, Hiram smoked marijuana nearly every single day. PSR, ¶62. By the time he was 15 or 16, he was also drinking heavily, sometimes as much as one or two pints in a single day. PSR, ¶61. He also used other drugs recreationally such as Xanax, Ecstasy and Lean. PSR, ¶¶63-65.

In addition to his difficulty understanding the academic material and his escalating drug and alcohol use, Hiram was the victim of two assaults that also contributed to his absenteeism. In 10th grade, he was robbed at gunpoint in the stairway at school. PSR, ¶41. He was too afraid of retaliation by the assailants to report the incident. *Id*. On another occasion, in the 11th grade, he was "set up for a

robbery" and "robbed by five to seven men who possessed knives." *Id.* As his childhood friend Noah said in a letter to the Court, Hiram was "bullied for being someone who wouldn't fight you back." Letter of Noah Ramirez, Exhibit F. Hiram told the probation officer that these two robberies were "among his worst memories" of his childhood. PSR, ¶42.

After his grandmother's death, Hiram "was increasingly permitted to remain outside the home late at night with relatively limited supervision (aside from text messaging) or follow-through regarding curfews and structure." Ex. E at 6. At sixteen, he began the process of getting his working papers. When he turned eighteen, he attended school only sporadically and began to work as a food delivery person for Uber Eats and Door Dash. PSR, ¶71.

During the seven months preceding his offense, Hiram began to spend long periods of unstructured time riding Citibikes throughout the city, as well as riding public transportation to explore the geography of various transportation routes. Ex. E at 6. He had a particular interest in trains and dreamed of becoming an MTA train or bus operator. PSR, ¶73.

When not exploring the city or delivering food, Hiram assisted his mother: "He worked so hard to take care of his mom all by himself." *See* Ex. G, Letter of ███████████. His friend Noah recalls: "Since his grandma died, it's just mainly been his mom who has been looking out for him. I know he takes care of his mom. . .to make sure she was okay." Ex. F. His mother explains, "With my mobility issues he was always attentive to my needs, going grocery shopping, get my medication, with doctor appointments. Help around the house, throwing out the trash." Ex. A.

Hiram has no history of violence, gang activity, prior fire-setting, or aggressive or assaultive behavior. He is described by those who know him as "a nice person," "a good kid," not "callous or malicious" but rather "passive, socially impressionable, concrete in his thinking, and poorly equipped to independently navigate increasingly complex and adolescent and adult demands." Ex. E at 6.

## Mental Health

After a comprehensive evaluation, Dr. Radcliffe determined that Hiram meets the criteria for the following diagnoses: ████████████████████ ██████████████████████████████████████████ ██████████████████ ost, if not all, of these diagnoses can be traced back to his premature birth and exposure to drugs *in utero*.

Already at risk, the one-two punch of his grandmother's death and the loss of school structure due to the COVID-19 pandemic knocked him off course in a way

that was hard for him to correct. Dr. Radcliffe describes her clinical observations: "Hiram is a developmentally vulnerable young adult with longstanding neurodevelopmental, executive functioning, educational, and adaptive difficulties that began early in life and persisted through childhood and adolescence." *Id*. "The available information further suggests that Hiram became increasingly disengaged from school, structure, and future-oriented goals during adolescence while simultaneously becoming more involved in unstructured peer activity, marijuana and alcohol use, independent wandering behavior, and nighttime activity in the city. These patterns appeared to emerge within the context of longstanding executive functioning vulnerabilities, limited supervision and behavioral structure, and increasing social drift rather than within a broader pattern of increasing antisocial conduct." *Id* at 11.

It was in this context that Hiram committed his offense, a senseless act motivated not by malice or violent urges, but rather by impulsiveness and a failure to fully appreciate the consequences of his actions. Dr. Radcliffe concludes, "None of the above factors excuse or justify the serious nature of the instant offense or the harm caused. However, in the undersigned's opinion, Hiram's actions occurred within the context of significant and chronic developmental, neurocognitive, educational, psychosocial, and adaptive vulnerabilities that substantially limited his maturity, judgment, behavioral regulation, and capacity for organized future-oriented decision-making during late adolescence and emerging adulthood." *Id*.

**Offense conduct**

In the early morning hours of December 1, 2025, Hiram walked onto the subway platform on his way home to the apartment he shared with his mother. Before entering the subway, he had no plan to cause harm to anyone. He had been drinking and smoking marijuana that day. Impulsively, after seeing a piece of paper on the floor of the subway car, he lit the paper on fire and placed it near a sleeping passenger whom he had never met.

His actions are inexplicable. At 3:05 am, when the fire flared up and engulfed the victim's legs as the train traveled uptown to 42nd Street, Hiram was on the platform at 34th Street, unaware of the extent of the harm he had caused. He did not know until the next day whether the paper had simply burned itself out. His actions were extraordinarily dangerous, and it is only because of the actions of first responders and medical professionals that the injuries were not worse.

Words are inadequate to express the profound shame and remorse that Hiram feels. He has spent his time at MDC, reflecting on his actions. Hiram's manner of expressing himself remains somewhat childlike. In his letter to the Court he writes, "If I could talk to the person I hurt directly, to the victim of my crime, I would say, I strongly apologize for my actions. I hope that you are doing better and

healing. When I think about what it must have been like for you, I tear up. I think a lot about what I did." Letter of Hiram Carrero, Ex. H.

Hiram has been meeting regularly with Federal Defender social worker Rachelle Williams, attempting to gain insight into his behavior. She reports that he has made significant progress: "Hiram demonstrated an improved ability to recount earlier experiences more insightfully and articulate his emotional responses." *See* Letter of Rachelle Williams, Director of Social Work, attached as Exhibit I. She adds, "During our work together, Hiram expressed deep shame and remorse for his actions." *Id*. at 1. His profound remorse is evident in his letter to the Court: "I am so so sorry. . . I just want Your Honor to know how sorry I am." Ex. H.

## Sentencing Guidelines

Hiram pleaded guilty without the benefit of a plea agreement or *Pimentel* letter. Probation has calculated that the total offense level is 28 and that Hiram has zero criminal history points, placing him in Criminal History Category I, with a corresponding guidelines range of 78 to 97 months. Probation recommends a downward variance to the statutory mandatory minimum, 60 months. While the defense agrees that a sentence of 60 months is appropriate in this case, we object to the guideline calculation.

Probation has determined the base offense level of 27 by cross-referencing the guideline for Attempted Murder, USSG §2A2.1. The defense objects and asks the Court to apply the Arson guideline, USSG §2K1.4(a)(1), which has a base offense level of 24 if the offense "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly." With an adjustment for acceptance of responsibility because of Hiram's guilty plea, the total offense level is 21, with a corresponding guideline range of 37 to 46 months, which becomes 60 months because of the applicable mandatory minimum.

In order to apply the Attempted Murder cross reference, the Government must establish, by a preponderance of the evidence, that Hiram had a specific intent to kill the victim. *See United States v. Belmar*, 2024 WL 2798860 at *3 (S.D.N.Y. May 31, 2024). In that case, the defendant engaged in a planned retaliatory shooting: he armed himself, wore a mask and gloves, and fired "6-7 shots in the direction of" rival gang members. *Id* at *2. The court found that the conduct was "premeditated," pointing to his preparation and motive, but nevertheless held that "the Government has failed to establish by a preponderance of the evidence that Belmar had a specific intent to kill," and therefore "the attempted murder Guideline does not apply." *Id*. at *4. Critically, the court emphasized that the "evidence does not establish that Belmar intended to kill, rather than to injure, scare, or send a message to the rival gang members." *Id*. at *5.

6

Similarly, in *United States v. Lucas*, 2023 WL 4209628 (E.D.N.Y. June 26, 2023), the defendant lay in wait, watched for the victim, exited a building, and fired multiple shots—facts the court found sufficient to establish that the shooting was "premeditated and deliberate." *Id.* at *2. But the court still declined to apply the cross-reference because "the evidence fails to establish that Lucas intended to kill the victim." *Id.* The court focused on the fact that the defendant fired from "more than twenty feet away," did not pursue the victim, and fled once the victim escaped. *Id.* at *3. It concluded that "[t]he Court can reasonably infer from Lucas' actions that he intended to scare the victim," and "can also reasonably infer that Lucas intended to injure the victim," but "cannot infer that Lucas intended to kill the victim." *Id.*

In *United States v. Powell*, No. 21-CR-205 (E.D.N.Y. Mar. 6, 2023), the court also found that the conduct clearly reflected premeditation but ultimately concluded that the Government had not met its burden on intent. The court emphasized that the surveillance video was "the only evidence" before it and that the defendant here was "shooting from across the street," leaving open the possibility that the conduct was intended to injure or intimidate rather than kill. ECF No. 37 at 38-39. Notably, the court acknowledged that the conduct could "look[] pretty obvious" as an attempt to kill but stressed that "that's not the standard"—the question is whether the evidence establishes specific intent by a preponderance, and where competing inferences remain, the Government has not carried its burden. *Id.* at 39.

In this case, as in *Powell*, the only evidence of the offense conduct is from surveillance videos. Hiram is shown picking up a single piece of paper which had been left as trash in the middle of a subway car. There was no presence of any accelerant such as lighter fluid or gasoline. The footage does not depict exactly where the paper is placed, but only that it was placed near to the victim. Almost immediately after lighting the paper, Hiram leaves the car, just as the doors are closing. PSR, ¶9. It is not until the train has pulled out of the station, traveling north without Hiram, that the fire flares up and engulfs the victim's legs. PSR, ¶10. There is no evidence that Hiram did anything after lighting the paper to ensure the fire took hold or to prevent the paper from simply burning itself out. Nor is there any evidence that Hiram fled the station after lighting the paper on fire. To the contrary, the surveillance video shows that he remained on the subway platform for approximately 40 minutes and briefly spoke with police who were on the platform.

There is no question that Hiram acted with a reckless disregard for the victim's safety and serious injury resulted from his conduct. However, that is insufficient to satisfy the "specific intent to kill" element needed for the cross reference. This evidence does not prove that Hiram specifically intended to kill, as opposed to injure or scare the victim. Thus, as in *Powell*, "competing inferences remain." Under these facts, U.S.S.G. §2K1.4(a)(1) is the applicable guideline.

If the Court disagrees and finds that the range is 78 to 97 months, the Court should follow the recommendation of the probation department and vary downwardly by 18 months to a sentence of 60 months.

## Hiram's youth is a powerful mitigating factor.

The Supreme Court has recognized that youth is a mitigating factor at sentencing. *See Miller v. Alabama,* 132  S. Ct. 2455 (2012). In *Miller*, the Court held that mandatory life without parole for juvenile offenders was unconstitutional. The Court focused on two separate aspects relevant to the sentencing of young offenders: their "lessened culpability" and their greater "capacity for change." *Miller*, at 2460.

With respect to "lesser culpability," the Court explained that "children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking. Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as well formed as an adult's; his traits are less fixed and his actions less likely to be evidence of irretrievable depravity." *Miller*, 132 S. Ct. at 2463-2464 (internal quotation marks and citations omitted).

The Court pointed out that these conclusions rest not just on common sense, but on the scientific study of human brain development, referring to well-researched scholarship "showing that only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior." *Miller*, 132 S. Ct. at 2464 (internal quotation marks and citations omitted). Thus, the Court reasoned, the scientific findings of "transient rashness, proclivity for risk, and inability to assess consequences ... both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Id*. at 2465 (internal quotation marks and citations omitted).

In 2016, the Supreme Court reaffirmed the principle that for purposes of sentencing, children are "different" from adults. *Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). Justice Kennedy elaborated on the concepts of children's "diminished culpability and greater prospects for reform." 136 S. Ct. 718, 733. He noted, "[a]s a corollary to a child's lesser culpability, *Miller* recognized that 'the distinctive attributes of youth diminish the penological justifications'" for imposing harsh sentences on juvenile offenders. [citations omitted] "Because retribution 'relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. . . The deterrence rationale likewise does not suffice, since 'the same characteristics that render juveniles less culpable than adults – their

immaturity, recklessness, and impetuosity – make them less likely to consider potential punishment. . . The need for incapacitation is lessened too, because ordinary adolescent development diminishes the likelihood that a juvenile offender 'forever will be a danger to society.'" *Montgomery*, 136 S. Ct. at 733 (internal citations omitted).

In Amendment 829, which went into effect in November 2025, a month before the offense conduct in this case, the United States Sentencing Commission adopted the reasoning of *Miller* and *Montgomery,* but expanded the age range for those deserving of leniency not just to minors but also to teenagers such as Hiram: "A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation." PSR, ¶95, fn2. Although the Amendment references "downward departure," it applies with equal force to a "downward variance."

Hiram is precisely the kind of "youthful individual" to which this Amendment should apply. His biological mother's drug use during pregnancy is an "adverse childhood experience" completely outside of his control that affected his brain development and maturity. As Dr. Radcliffe wrote in her report, "Research literature has associated prenatal opioid exposure, including methadone exposure, with increased risk for prematurity, neurodevelopmental vulnerability, attention and executive functioning difficulties, behavioral dysregulation, and later cognitive and academic impairments." Ex. E at 10.

In addition, "multiple sources described Hiram as socially passive, immature for his age, and highly susceptible to peer influence." Ex. E at 5. His middle school teacher described his difficulties understanding cause and effect: "I remember him as lacking confidence and unable to hold even moderate amounts of information for recall. Academically, he would require all information to be presented in small chunks before being asked either literal or inferential questions. Specifically, Hiram's learning disability prevented him from making connections that would allow him to make higher level inferences. He could not use previous information to inform decisions that characters would make in a text. Similarly, he could not reliably make connections between cause and effect. He simply did not have the ability to make predictions as a result of a low level of fluid reasoning." Ex D.

The conduct in this case represents precisely the kind of "transient rashness, proclivity for risk, and inability to assess consequences" which the *Miller* Court

determined "lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Miller*, supra at 2465.

Hiram's lack of prior criminal conduct, his clean disciplinary record while at MDC and his positive response to counseling with Federal Defender social worker Rachelle Williams also bode well for his "prospects for reform" and demonstrate that he is "amenable to rehabilitation." Dr. Radcliffe concludes, "I would further note that Hiram remains a relatively young individual whose developmental trajectory appears characterized more by arrested emotional and adaptive development than by entrenched antisocial or chronic violent behavior. Consistent with his developmental stage, he remains in a period of ongoing maturation involving executive, emotional, and behavioral capacities. With appropriate structure, supervision, treatment, substance abuse intervention, vocational support, and continued psychological services, there remains meaningful potential for further maturation and rehabilitation over time." Ex. E at 11.

## Plans for re-entry

Hiram has already begun the hard work of planning for his life after prison. For the past seven months, he met regularly with the Director of Social Work at Federal Defenders, Rachelle Williams. *See* Ex. I. Ms. Williams writes, "He was vulnerable and transparent in sessions; he used the space to reflect upon his life, process past and present challenges and think more intentionally about his future." Ex. I at 2. Despite the limited offerings at MDC, he has completed a parenting program and the science portion of his GED. PSR, ¶4. He has no disciplinary infractions. *Id*.

Together, Ms. Williams and Hiram have created a comprehensive reentry plan designed to provide the support he needs to be successful upon release from custody. *Id*. The proposed plan incorporates the individualized recommendations suggested by Dr. Radcliffe. Along with psychological support, including outpatient substance abuse treatment, and vocational/educational training, the centerpiece of the plan is Hiram's participation in youth reentry programs. These programs are designed for young people aged 24 or younger, "incorporate therapy and mentorship, and intentionally separate young participants from adults." *Id*. at 5-6.

The Court must impose a sentence that provides Hiram with "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Ms. Williams has identified youth programs which are tailored to meet these needs and significantly reduce the chance of recidivism. A sentence of sixty months will ensure that Hiram has the opportunity to participate in these programs before he ages out.

## Community Support

As Hiram wrote in his letter to the Court, in order to survive at MDC, he has simply been "taking it one day at a time." Ex. H. With encouragement from Rachelle Williams, he has begun to envision what his future might look like. He is fortunate to have friends and family to support him when he is released from whatever sentence the Court imposes. His mother, who has been struggling while living on her own, writes, "Not sure what the future holds for me and him, but no matter he will have my full support now and always." Ex. A.

Those who know and love him are "dumbfounded" and in disbelief that the Hiram they know could have hurt anyone. His aunt explains, "if he was a bad kid then maybe I could understand this but he never was so it's been so hard for me to believe it. Hiram has always been a calm kid." Ex. B. His childhood friend expresses a similar sentiment: "I still can't believe he did this. Not just because he's my friend, but because I know Hiram and he's not a person who would do something like this." Ex. F.

He has confided in his friend about some of his goals for the future: "I know he wants to finish school and would try to get a job and take care of his mom. He's really close with her. . . I would support him anyway I could, especially morally if he needs anyone to talk to. I'll always be there for him to make sure he's good." *Id*.

Another friend writes, "I can tell he feels real remorse and I know this situation has affected him deeply. He knows he let people down and  . . . he's said he wants to do better. . . I know he is going to do better not just for him but for his mom. He's going to continue working and become a better person and I will support him and help him stay on the right path" Ex. G.

His former teacher remains hopeful: "He so badly needs the structured supports that were never consistently available to him. My hope is that somehow there could be a positive outcome for Hiram. . . As an educator of students with disabilities, I genuinely believe that with the right interventions and support, Hiram still has the potential to lead a meaningful life." Ex. C.

## Conclusion

This is a sad case. The victim will have "long-term extensive scarring and disfigurement." PSR, ¶16. As his former teacher wrote, "Hiram was a student I never forgot, and I was deeply saddened when I learned what he had done. I do not know what could have motivated Hiram to do what he did that morning on the train . . . I do know that the younger Hiram was not a malicious individual." Ex. C.

11

Probation's recommendation of sixty months strikes the right balance, weighing the seriousness of the offense and need for deterrence and punishment against Hiram's youth, disability, lack of prior criminal conduct and demonstrated remorse.

Long after he is released from custody, Hiram will have to live with the guilt of the suffering he caused. He will carry this weight for the rest of his life. But he is a teenager, who, with appropriate support, still has the capacity to grow into a mature, kind, young man, capable of caring for others. We ask that you give him that opportunity by imposing a sentence "no greater than necessary" to serve the purposes of sentencing, in this case a sentence of sixty months.

Respectfully submitted,

Jennifer L. Brown
Attorney-in-Charge
Federal Defenders of New York
(646) 763-1420

cc:    AUSA Cameron Molis