

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

June 19, 2026

**BY ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

> **Re:**   *United States* **v.** *Hiram Carrero*, **25 Cr. 593 (LJL)**

Dear Judge Liman:

The Government respectfully submits this letter in advance of the June 23, 2026 sentencing of defendant Hiram Carrero. In December 2025, Carrero lit a sleeping homeless man ("Victim-1") on fire on a New York City subway car. (Presentence Investigation Report ("PSR") ¶¶ 6-8). Victim-1 sustained life-threatening injuries, extensive scarring, and disfigurement. (PSR ¶ 16). Thanks to the rapid intervention of first responders, Victim-1 was not killed in the attack. (PSR ¶¶ 11; 16.). Carrero's sentencing submission calls his crime "senseless" and "inexplicable." (Dkt. 15 at 5). The Government agrees, and submits that his heinous actions necessitate a term of imprisonment at the top of the applicable United States Sentencing Guidelines ("Guidelines") range of 78 to 97 months' imprisonment, as calculated by the United States Probation Office (the "Probation Office"). For the reasons explained below, such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing in this case, taking into account the relevant factors under 18 U.S.C. § 3553(a).

## I.      Background

### A.      The Offense Conduct

On December 1, 2025, at approximately 3:02 a.m., Carrero entered a New York City subway car at the 34th Street – Penn Station subway stop, in which Victim-1 was sleeping. (PSR ¶ 6). Carrero, circled in red in the images below, looked inside the subway car before exiting and

walking further down the platform. (*Id.*). A discarded piece of paper, circled in yellow in the images below, lay at the end of the car furthest from Victim-1. (**Image-1**); (Ex. A at 0:03-0:10).[1]



**Image-1**

---

[1] The screenshots have been taken from security footage on the subway and station that were produced to the defendant in discovery.



**Image-1 (enlarged)**



**Image-1 (enlarged)**

Approximately one minute later, Carrero entered the subway car again, this time from the side where Victim-1 was sleeping. (PSR ¶ 7). Carrero paused for a moment, before running to the

back of the car, picking up the discarded piece of paper, and running back to where Victim-1 slept. (*Id.*); (**Image-2**); (Ex. A at 0:32-0:53; Ex. B at 0:11-0:23).



**Image-2**

Carrero then stepped out of view of the security camera inside of the subway car. Seconds later, the automatic subway car doors started to close and reopened temporarily. The reflection in the vertical handrail on the left side of the screenshot of security camera footage below shows the ignition of a flame (circled in red in the following image) from Carrero's approximate position near the subway car doors. (PSR ¶ 8); (**Image-3**); (Ex. A at 0:56-1:08).



**Image-3**

A second view into Carrero's subway car, captured on surveillance camera footage from the adjoining subway car, similarly shows Carrero igniting a flame through the window between the two subway cars, as depicted and circled in red in the images below at the same approximate time. (PSR ¶ 8); (**Image-4**); (Ex. B at 0:11-0:35).



**Image-4**



**Image-4 (enlarged)**

Carrero then stepped out of the subway car. (PSR ¶ 9). The subway car doors close, without reopening, and the train begins to pull out of the station as the flame catches and Victim-1 burns. (PSR ¶¶ 9-10). Before the car has left the station, the fire (circled in red in the images below) can be seen growing in multiple places, engulfing the subway bench and Victim-1. (**Image-5**); (Ex. B at 0:47-1:20; Ex. A at 1:11-2:03).



**Image-5**



**Image-5 (enlarged)**

In the footage, screenshots of which are displayed below, the subway car can be seen filling with smoke as Victim-1 (circled in red) stands and then falls. (**Image-6**); (Ex. B at 1:27-1:54; Ex. A at 2:04-3:11).



**Image-6**



**Image-6 (enlarged)**

The travel time between 34th Street – Penn Station and the next stop at 42nd Street – Times Square is mercifully short—only approximately two minutes and twenty seconds from the time the doors closed at one station and opened at the next. But after Victim-1 emerged from the subway

at the Times Square station, law enforcement found Victim-1 on the platform with his legs still engulfed in flames. (PSR ¶ 11); (**Image-7**); (Ex. C at 0:01-0:37).



**Image-7**

### B.    Impact to Victim-1

Law enforcement and first responders rushed Victim-1 to the hospital in critical condition with life-threatening injuries.[2] (PSR ¶¶ 11; 16).



---

[2] As part of this submission, the Government has provided relevant medical treatment records for Victim-1, which the Government respectfully requests that the Court accept under seal. The Government has also redacted portions of this letter that directly refer to the details of Victim-1's treatment records.



Victim-1 was released from the hospital on Mach 12, 2026 to recover with his family.

## C.    Procedural History

Law enforcement arrested Carrero on December 4, 2025. The following day, the Honorable Robert W. Lehrburger, United States Magistrate Judge for the Southern District of New York, authorized a complaint charging Carrero with one count of arson causing injury to a person, in violation of 18 U.S.C. § 844(f) (the "Complaint"). (Dkt. 1). Carrero was presented before Judge Lehrburger on the same day. (Dkt. 3).

On December 18, 2025, a grand jury in this District returned a one-count indictment charging Carrero with arson, in violation of 18 U.S.C. § 844(f) (the "Indictment"). (Dkt. 5).

On March 5, 2026, Carrero pled guilty to the sole count of the Indictment. During his allocution, Carrero admitted that he, "intentionally lit a piece of paper on fire on the subway which caused damage to the subway car in Manhattan," and that it was "[his] understanding that the MTA is receiving federal funding." (Plea Tr. at 29). He also answered "Yes," when the Court asked if he intended to do damage to the subway. (*Id*. at 30).[3]

## D.    The Presentence Investigation Report and Guidelines Calculation

As explained in more detail below, the Probation Office calculated a total Offense Level of 28, which together with the Criminal History Category of I (based on no prior convictions), yielded an applicable Guidelines range of 78 to 97 months' imprisonment (the "Applicable Guidelines Range"), consistent with the Government's representations during the change of plea hearing. (PSR ¶ 80); (Plea Tr. at 6). The Probation Officer concluded by recommending a sentence of the mandatory minimum of 60 months' imprisonment, (PSR at 24), the same term of imprisonment recommended by Carrero. In doing so, the Probation Office emphasized aggravating factors in this case, such as the fact that Carrero "targeted [Victim-1] as he slept" and that Victim-1 "sustained permanent and life-threatening injuries." (PSR at 25). It also found mitigating factors in Carrero's age, mental health, and substance use issues. (*Id*.)

---

[3] The Government had previously moved to adjourn the change of plea hearing to allow it to address an error in which the Indictment failed to specifically allege that Carrero engaged in conduct that "directly or proximately cause[d] personal injury or create[d] a substantial risk of injury to any person," as required by 18 U.S.C. § 844(f)(2). (Dkt. 9). The Court denied the Government's motion and accepted Carrero's plea to the existing Indictment.

## II.    Discussion

### A.    Applicable Law

While the Guidelines are no longer mandatory after *United States v. Booker*, 543 U.S. 220 (2005), they remain "the starting point and the initial benchmark" in fashioning an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). Courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range," *id*., before proceeding to consider the seven factors outlined in 18 U.S.C. § 3553(a):  (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the United States Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims." 18 U.S.C. §§ 3553(a)(1)-(7).

In fashioning a sentence, the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)    to afford adequate deterrence to criminal conduct;
(C)    to protect the public from further crimes of the defendant; and
(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). While the Guidelines range no longer sets absolute boundaries for appropriate sentences, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Pollock*, 139 F.4th 126, 145 (2d Cir. 2025) (quoting *United States v. Friedberg*, 558 F.3d 131, 137 (2d Cir. 2009).

### B.    The Facts Support a Guidelines Offense Level of 28 Based on the Application of the Attempted Murder Cross Reference Under the Guidelines

#### i.    The Applicable Guidelines Calculation

The parties and the Probation Office agree that U.S.S.G. § 2K1.4 is the proper Guideline for arson crimes such as 18 U.S.C. § 844(f). (PSR at 5; 22). The parties and the Probation Office further agree that under Section 2K1.4(a)(1), the base offense level would be 24. (*Id*.)

However, Section 2K1.4 also contains a cross-reference that increases the applicable base offense level "[i]f death resulted, or the offense was intended to cause death or serious bodily injury." U.S.S.G. § 2K1.4(c)(1). In those situations, courts are directed to apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is

greater than that determined under Section 2K1.4. *Id*. The Government and the Probation Office agree that this cross-reference should apply, and the most analogous guideline from Chapter Two, Part A is U.S.S.G. § 2A2.1(a)(2), which applies to crimes involving assault with intent to commit murder and attempted murder, where the object of the offense would not have constituted first degree murder. (PSR ¶ 21). Under this framework, the base offense level under U.S.S.G. § 2A2.1(a)(2) is 27. (*Id*.). The Government and the Probation Office also agree that, because Victim-1 sustained permanent or life-threatening bodily injury, the offense level is increased by four levels. (PSR ¶ 22); U.S.S.G. § 2A2.1(b)(1)(A). The resulting offense level is 31. (PSR ¶ 26).

The parties and the Probation Office agree that the offense level should be decreased by three levels based on the defendant's acceptance of responsibility, U.S.S.G. §3E1.1(a), and his timely notification of his intention to plead guilty, U.S.S.G. § 3E1.1(b). (PSR ¶¶ 28-29).

Against that backdrop, both the Government and the Probation Office agree that the adjusted offense level (applying the attempted murder cross reference) is 28. (PSR ¶ 30). The defendant argues that the Court should apply only the base offense level under U.S.S.G. § 2K1.4(a)(1) and find an adjusted offense level of 21. (PSR at 22). As explained below, the Court should find that the attempted murder cross reference applies, the adjusted offense level is 28, and that the Applicable Guidelines Range of 78 to 97 months' imprisonment applies.

### ii.    The Attempted Murder Cross Reference Should Apply

Attempted murder is an attempt to commit any type of murder and "requires a specific intent to kill." *United States v. Mumuni*, 946 F.3d 97, 108 (2d Cir. 2019) (quoting *United States v. Kwong*, 14 F.3d 189, 194 (2d Cir. 1994))*; see also United States v. Christian*, No. 23-6933, 2024 WL 3466547, at *2 (2d Cir. July 19, 2024). Murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). While premeditated killings are first-degree murder, second-degree murder is any murder that does not meet the requirements for first-degree murder. *See id.* "[T]here is no plausible argument that 'premeditation' is required for a killing to constitute murder as defined in . . . [§] 1111." *United States v. Capers*, 20 F.4th 105, 130 (2d Cir. 2021).

"By necessity, intent must usually be proven by circumstantial evidence." *Kwong*, 14 F.3d at 194 (using circumstantial evidence to find a specific intent to kill based on the design of a booby trap); *see also Mallette v. Scully*, 752 F.2d 26, 32 (2d Cir. 1984) ("Because intent is formed in the mind in secrecy and silence and the human mind functions at a speed impossible to measure, a determination of whether a deliberate intent was formed must be drawn from all the circumstances of the case.") There is no exception for finding intent to kill in the context of arson crimes. *See United States v. Polanco*, 496 F. App'x 639, 645 (7th Cir. 2012) (defendants' intent to kill could be inferred from their using an accelerant to set fire to a building they knew to be occupied). Courts applying New York law have also concluded that a defendant's intent to kill by means of fire may similarly be established through circumstantial evidence. *See People v. Burton*, 215 A.D.3d 1054, 1058 (3d Dep't 2023). In *Burton*, the court held the "defendant's intent to kill the ex-girlfriend . . . was readily established by defendant's use of an accelerant to light a fire during the early morning hours with knowledge that the residents of the third-floor apartment were home." *Id*.

Here, the intent to kill is evident from the defendant's actions, as captured on video surveillance. Carrero stood over a sleeping, homeless man and ignited a piece of paper in order to set him on fire. Carrero then left Victim-1 in an empty, closed subway car as the fire grew. That is ample circumstantial evidence of Carrero's intent to kill.

Carrero claims that, "[b]efore entering the subway, he had no plan to cause harm to anyone." (Dkt. 15 at 5). He calls his decision to start the fire "[i]mpulsive[]," and his actions "inexplicable." But, attempted second degree murder does not need to be premeditated, and an intent to kill need not be formed well in advance of a crime. *See Capers*, 20 F.4th at 130. Carrero allocated at his plea hearing to the fact that he "[i]ntentionally lit a piece of paper on fire on the subway which caused damage to the subway car." (Plea Tr. at 29). It was only after additional colloquy with the Court under oath that Carrero admitted that he "intend[ed] to do damage to the subway." (*Id*. at 30). But this is not a case where Carrero never reentered Victim-1's subway car and just set fire to its exterior—though courts have found an intent to kill in similar circumstances. *See, supra*, *Polanco*, 496 F. App'x at 645 (intent to kill could be inferred where defendant used an accelerant to set fire to a building, knowing it was occupied); *Burton*, 215 A.D.3d at 1058 (same). Nor is this a case where Carrero entered that subway car and set fire to the discarded piece of paper where he found it, on the opposite side of the car from Victim-1. Carrero made a series of choices: to return to the same car that he had looked into minutes earlier, to bring the piece of paper from one side of the car to the other, where Victim-1 was sleeping, and then to use that piece of paper to set Victim-1 on fire. The defense submission's allusions to Carrero's diminished ability to "make predictions," "understand[] cause and effect," or "assess consequences" are not credible in light of these facts. (Dkt. 15 at 9).

Carrero cites three cases in arguing that the above facts do not demonstrate an intent to kill. (*Id*. at 6-7). All are readily distinguishable:

In *United States v. Belmar*, No. 21-CR-16 (KMW), 2024 WL 2798860 (S.D.N.Y. May 31, 2024), the court found that the Government had not established an intent to kill where the defendant had fired 6–7 shots in the direction of rival gang members, who were standing down the block from him. While Carrero's argument focuses on the fact that *Belmar* involved a planned and premeditated shooting in which the shooter armed himself, wore a mask and gloves, and fired multiple shots, the court in *Belmar* had a different focus. Specifically, Judge Wood's opinion repeatedly emphasizes that the Government could not prove the defendant had an intent to kill because of the defendant's proximity to his targets: "[t]he Government has not established by a preponderance of the evidence that Belmar was within close range relative to the rival gang members when he fired at them," and "the Court cannot infer from the distance between Belmar and the rival gang members that he had a specific intent to kill." *Id*. at *5. Judge Wood also found that there was "no evidence that Belmar's bullets landed at a height capable of injuring the rival gang members." *Id*. By contrast, in this case, Carrero stood within arm's reach of Victim-1 when he set him on fire, and intentionally took the paper he used from one end of the subway car to the other (where Victim-1 was sleeping) before igniting it.

The same focus on proximity underlies the defense's other two cases: *United States v. Lucas*, No. 19-CR-467 (MKB), 2023 WL 4209628, at *3 (E.D.N.Y. June 26, 2023) and *United States v. Powell*, No. 21-CR-205 (LDH), ECF No. 37 (E.D.N.Y. Mar. 6, 2023). In *Lucas*, the court

held that, "in view of the fact that Lucas fired a weapon while standing at a substantial distance from the victim — at least three car lengths, did not pursue the victim even though he was aware that the victim was likely not hit by any of the bullets fired, and instead fled the scene of the crime after he observed the victim flee in a different direction, the Court cannot infer that Lucas intended to kill the victim." 2023 WL 4209628, at *3. In *Powell*, the court could not make a finding that the defendant fired a gun with an intent to kill "given his proximity to the vehicle," and "given the angle that he chose to shoot from . . . . an angle that would make shooting a passenger in the car more difficult, not less difficult." *Powell*, ECF No. 37, at 39. Here, Carrero and Victim-1 were not separated by three car lengths, or some unworkable angle; they were hardly separated by the length of a subway bench.

What Carrero's cited cases do demonstrate is that courts often address a defendant's intent to kill in the context of firearms and shootings—lighting a defenseless person on fire is a far less common crime. Courts in this Circuit have emphasized that, "[a]lthough the mere fact that a deadly weapon was used does not ipso facto prove the specific intent, only a minimal additional showing of intent is necessary." *McCallum v. United States*, No. 14-CR-476, 2019 WL 5088587, at *7 (S.D.N.Y. Mar. 1, 2019) (citations omitted) (collecting cases), *abrogated on other grounds by United States v. Davis*, 588 U.S. 445 (2019). While Carrero did not use a firearm, the fire he started was necessarily dangerous and deadly. *See Santana v. Holder*, 714 F.3d 140, 145 (2d Cir. 2013) ("Fire is a powerful weapon – easy to wield, capable of overwhelming destruction, and difficult if not impossible to control."). And as Carrero admits, "[h]is actions were extraordinarily dangerous, and it is only because of the actions of first responders and medical professionals that the injuries were not worse." (Dkt. 15 at 5).

For the foregoing reasons, Carrero's actions demonstrate an intent to kill Victim-1, a sleeping, homeless man, by setting him on fire. The attempted murder cross reference should therefore apply.

### iii.    Victim-1 Sustained Permanent or Life Threatening Bodily Injury

"Permanent or life-threatening bodily injury," is defined as "injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent; or an obvious disfigurement that is likely to be permanent," U.S.S.G § 1B1.1, cmt. n.1(J); *see also United States v. Price*, 149 F.3d 352, 354 (5th Cir. 1998) ("The plain language of application note 1[(j)] encompasses injuries that may not be terribly severe but are permanent, hence the disjunctive: 'permanent or life- threatening injuries.'").

As described above, *supra* ¶ I(B), Victim-1's burns left him in critical condition with life-threatening injuries. (PSR ¶ 16). He arrived at the hospital with third-degree burns to fourteen percent of his total body surface area, (*id.*), which can be seen in the image of his legs below, taken on the same night that he was set on fire. (**Image-8**).



**Image-8**

Victim-1's injuries more than meet the criteria to be classified as permanent or life-threatening. *See United States v. Cross*, 121 F.3d 234, 238 (6th Cir. 1997) (holding that a four-level offense level increase was justified by "multiple burns inflicted on [the victim] constituted a serious permanent injury").

*    *    *

Against that backdrop, the Government respectfully submits that the Court should find that the Applicable Guidelines Range of 78 to 97 months' imprisonment applies.

### C.    A Sentence at the Top of the Applicable Guidelines Range Is Necessary and Appropriate

The Government agrees with the Probation Office that Carrero's Applicable Guidelines Range is 78 to 97 months' imprisonment, (PSR ¶ 80), and respectfully submits that a sentence at the top of this range is sufficient but not greater than necessary to achieve the purposes of punishment, taking into account the applicable sentencing factors under 18 U.S.C. S3553(a).

*First*, the seriousness of Carrero's crime cannot be overstated. *See* 18 U.S.C. § 3553(a)(2)(A). Carrero attempted to kill a sleeping, homeless man by burning him alive and leaving him trapped on a moving subway car. Victim-1 owes his life to the chance facts that (i) the subway proceeded, without delay, along the mercifully short trip between 34th Street – Penn Station and 42nd Street – Times Square in approximately two minutes and twenty seconds; and (2) first responders were able to reach him quickly when he left the train, still burning, onto the subway platform. Neither of these facts were guaranteed at the time Carrero set Victim-1 on fire, and such a heinous crime, separated from murder by mere chance, deserves a fitting punishment. Accordingly, the seriousness of the offense and the need to promote respect for the law and just punishment counsel in favor of a sentence at the top of the Applicable Guidelines Range.

*Second*, there is a compelling need to protect the public from further crimes of the defendant because it is apparent that Carrero remains a danger to the public. *See* 18 U.S.C. § 3553(a)(2)(C). Carrero calls his crime "senseless" and "inexplicable." (Dkt. 15 at 5). Other than the fact that he was apparently drinking and smoking marijuana that day, (*see id*.), there is no further explanation, justification, or motive offered to explain what caused Carrero to do what he did. To light a sleeping, homeless man on fire, for seemingly no reason at all, is precisely the sort of "inexplicable" act of cruelty that the public must be protected from. If there is no explanation for why Carrero set Victim-1 on fire in the first place, there can be little comfort in his assurances that he would never recidivate. The defendant's willingness to escalate sharply into a senseless act of violence, seemingly without provocation, remains a significant concern for the Government.

*Third*, the inherent and escalating danger of fires demands that Carrero and other would-be arsonists be deterred from ever setting them. *See* 18 U.S.C. § 3553(a)(2)(B). Even arsonists, unlike Carrero, who lack any intent to kill, put lives in danger with every fire they set. Judge Batts explained the inherent danger of arson at sentencing in *United States v. Raposo*, No. 98-cr-185 (S.D.N.Y. June 8, 1999), a case in which the defendant's decision to set fire to a building claimed the life of a responding firefighter:

> Once a fire is started and the forces of nature are invoked, no person can know what the final toll of destruction or death will be. The point at which individuals can control fire is in deciding not to set them. Once they set a fire, they must be held responsible for all the consequences of their actions.

Sentencing Tr. at 18:7-13 (Dkt. 91-1). Indeed, Carrero's decision to set fire to Victim-1, a homeless man who was sleeping on the subway, is disturbingly similar to the killing of Debrina Kawam, less than one year earlier.[4] Ms. Kawam was also homeless and sleeping on a parked subway car when her killer set her on fire on December 22, 2024. Public spaces like the New York City subway system demand assurances of passenger safety, and it is imperative that the public understands that there is zero tolerance for acts of violence on public transportation. Accordingly, in addition to specific deterrence for Carrero, a sentence within the Applicable Guidelines Range will send an appropriate message to those who would engage in similar conduct that their actions will be met with a punishment commensurate with the tragic harm arson can and does inflict. Indeed, a rapidly

---

[4] New York Times: *What We Know About the Fatal Burning of a Woman on the Subway* (Dec. 24, 2024), https://www.nytimes.com/2024/12/24/nyregion/nyc-subway-fire-what-to-know.html.

spreading fire and smoke in an underground transit system has the potential to cause widespread panic, injury, and loss of life.

Carrero argues that the lowest possible sentence available in this case is the just outcome due to his age, the circumstances of his birth, and his use of marijuana and alcohol. The Government acknowledges the potentially mitigating nature of some of these factors, but they cannot justify this sentence in light of (i) the seriousness of Carrero's offense, (ii) the need to protect the public from Carrero's inexplicable and senseless conduct, and (iii) the substantial need to deter arsonists. It is inconceivable that Carrero's youth and mental health stripped him of the ability to understand the pain and destruction that fire can cause, both to inanimate objects and to a human body. People far younger than Carrero are taught about the dangers of fire from parents and caregivers from a very early age. As such, the Court should reject the defendant's arguments that these factors justify, not just a below-guidelines sentence, but the lowest sentence permissible by law.

## III.   Conclusion

For the foregoing reasons, the Government respectfully submits that the Court should impose a sentence at the top of the Applicable Guidelines Range of 78 to 97 months' imprisonment, to be followed by a three-year term of supervised release.[5]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: _____
   Cameron Molis
   Assistant United States Attorney
   (212) 637-1085

cc:   Jennifer Brown, Esq. (by ECF)

Enclosures:
   Exhibit A – Surveillance Video 1
   Exhibit B – Surveillance Video 2
   Exhibit C – Victim Video 1
   Exhibit D – Victim Medical Records

---

[5] The Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). S*ee, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).